# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

               Plaintiff,

v.

Benjamin Robert Yackel (3),

               Defendant.

Crim. No. 18-170 (WMW/BRT)

**REPORT AND RECOMMENDATION**

---

Thomas M. Hollenhorst, Esq., Assistant United States Attorney, counsel for Plaintiff.

Robert A. Lengeling, Esq., Beito & Lengeling, PA, counsel for Defendant Yackel.

---

BECKY R. THORSON, United States Magistrate Judge.

On July 10, 2018, Defendant Benjamin Robert Yackel was indicted on one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, four counts of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2, one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A), and one count of felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. No. 1.) This matter is before the Court on Defendant's Motion to Suppress Evidence (Doc. No. 75) and Defendant's Second Motion to Suppress Evidence (Doc. No. 76), specifically seeking suppression of evidence resulting from two traffic stops – one that occurred on December 19, 2017, in Brown County, Minnesota, and the other that occurred on December 27, 2017, in

Brooklyn Park, Minnesota. This Court held a hearing on the motions on October 5, 2018, whereby the Government presented three witnesses and offered Exhibits 1 through 5. (Doc. Nos. 86, 87.) The Court allowed post-hearing briefing on these motions and received Defendant's brief on October 23, 2018, and the Government's responsive brief on October 30, 2018. (Doc. Nos. 101, 105.) The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons set forth below, this Court recommends that Defendant's Motion to Suppress Evidence (Doc. No. 75) be denied, and Defendant's Second Motion to Suppress Evidence (Doc. No. 76) be granted in part and denied in part.

## DISCUSSION

### I. December 19, 2017 traffic stop

#### a. Background

Deputy Robert Hillesheim from the Redwood County Sheriff's Office testified as follows about the December 19, 2017 traffic stop and regarding information that officers were aware of leading up to the traffic stop. (Hr'g Tr. 10–39.)

Starting in 2013, Deputy Hillesheim was assigned as an agent and narcotics investigator with the multi-jurisdictional drug task force, which included Brown, Lyon, Redwood, and Renville Counties. (Hr'g Tr. 10.) On December 18, 2017, Deputy Hillesheim was contacted by a credible reliable informant[1] ("CRI") who said that he had

---

[1] Deputy Hillesheim testified that the CRI had assisted with over six first degree felony controlled substance purchases for Deputy Hillesheim, and over a dozen different times had provided information to Deputy Hillesheim that he has been able to corroborate

(Footnote Continued on Next Page)

been in contact numerous times with an individual from the metro area, D.K.,[2] who would be bringing three pounds of methamphetamine down into Brown County and would sell it to the CRI for $19,000.00. (Hr'g Tr. 10–11.) Deputy Hillesheim then met with the CRI in person and recorded a call between the CRI and D.K. wherein D.K. agreed to come down and deliver the methamphetamine that evening and that he would be driving a black Ford Expedition. (Hr'g Tr. 12–13, 36–37.) On that call, although there was no direct talk of a drug sale, based on his experience in general and his experience working with this CRI previously, Deputy Hillesheim believed the discussion to involve a drug sale. (Hr'g Tr. 12, 28.) After that call, officers conducted a background check on D.K. and learned that, although there was no black Expedition registered to D.K., he drove one.[3] (Hr'g Tr. 12–13, 38.)

During the evening of December 18, 2017, the CRI informed Deputy Hillesheim that D.K. was not planning to drive down that evening because a co-conspirator had been arrested. (Hr'g Tr. 13.) The officers confirmed through a Minnesota Department of Public Safety State Patrol report that this certain person had been arrested at about 9:32 p.m. on December 18, 2017. (*Id.*)

---

(Footnote Continued from Previous Page)
through his own independent investigations. (Hr'g Tr. 18.) Deputy Hillesheim described him as a "long-term confidential reliable informant." (Hr'g Tr. 18.)

[2]     The CRI told Deputy Hillesheim that he had dealt with D.K. two other times over a six-month span. (Hr'g Tr. 18.)

[3]     It was later learned that the black Ford Expedition was registered to D.K.'s father. (Hr'g Tr. 39.)

Later, at 4:00 a.m. on December 19, 2017, the CRI called Agent Amber Meyer,[4] who then called Deputy Hillesheim, stating that D.K. and two other people had arrived at the farm site where the CRI lives, in a Ford Expedition. (Hr'g Tr. 14–15, 29.) The two other people were later identified as Defendant Yackel and Co-Defendant Kendra Johnson. (Hr'g Tr. 16, 21.) The CRI told Deputy Hillesheim that he saw them with one smaller bag with about an ounce of methamphetamine and that it was his belief, based on conversations with the three individuals, that they had another two pounds of methamphetamine per the arrangement. (Hr'g Tr. 16–17, 30.) Deputy Hillesheim then talked with the CRI over the phone and instructed the CRI to "come up with a reason to leave the farm site," which he did. (Hr'g Tr. 15.)

Deputy Hillesheim arranged for marked patrol units to surround the section of land where the CRI's farm was located.[5] (Hr'g Tr. 16.) Deputy Hillesheim and the CRI met and placed a phone call to D.K., who was still back at the farm site. (Hr'g Tr. 15.) The CRI told the three individuals that he did not have all of the money, that he needed to go into the City of Evan, a small town located in Brown County, to pick up the money from another source, and that the three individuals should leave the farm site and to go to the City of Evan to make the transaction. (Hr'g Tr. 16, 18.) At approximately 8:00 a.m., the officers observed the Expedition traveling southbound toward the City of Evan on the

---

[4]     Agent Meyer also works on the drug task force with Deputy Hillesheim. (Hr'g Tr. 14.)

[5]     It was not practical for the officers to conduct closer surveillance because of the farm site's size, and open and remote location. (Hr'g Tr. 35.)

gravel road that leaves the farm site. (Hr'g Tr. 17, 31–32.) Deputy Hillesheim testified that he believed at that time that there would be evidence of a crime within the vehicle. (Hr'g Tr. 20.) He radioed the marked units to make a probable cause stop of the vehicle, which they did.[6] (Hr'g Tr. 17, 19.)

After the stop, officers approached both sides of the vehicle with weapons drawn. (Hr'g Tr. 33.) Deputy Hillesheim approached the driver's side door of the vehicle, opened it, and asked the driver—who was Defendant Yackel—to step out. (Hr'g Tr. 20.) Deputy Hillesheim searched Yackel for weapons and found cash and a needle in his pockets.[7] (Hr'g Tr. 20, 24, 34.) The other two passengers—Johnson and D.K.—also exited the vehicle and were searched. When Defendant Johnson was searched, 26 grams of methamphetamine was retrieved off her person. (Hr'g Tr. 21.) The three individuals were detained. (Hr'g Tr. 20, 22.) The Expedition was sealed off and the officers had a towing company remove it from the scene. (Hr'g Tr. 23.) No search of the vehicle was conducted at the time of the stop. (Hr'g Tr. 24–25.) Deputy Hillesheim drafted a search warrant application for the Expedition later during the morning hours on December 19, 2017.[8] (Doc. No. 87, Hr'g Ex. 1.)

---

[6]     There was no traffic violation that took place that preceded the stop. (Hr'g Tr. 32.)

[7]     Defendant Yackel does not challenge the search of his person during this stop.

[8]     Defendant Yackel does not seek to suppress evidence based on the validity or execution of this search warrant in his pre-trial motions.

### b. Analysis

Defendant Yackel argues that the stop of the vehicle on the morning of December 19, 2017, was not based on probable cause and the officers had no basis to conduct a felony stop. (Doc. No. 101, Def.'s Mem. of Law in Supp. of Mots. to Suppress ("Def.'s Mem.") 4–5.) He asserts that the officers acted "prematurely" because "nothing criminal had occurred" at the time of the stop. (*Id.* at 5.) In particular, Yackel asserts that "[n]o transaction had taken place, there was no corroboration of the informant's claims, and it is not established that the informant actually saw any drugs prior to fleeing his residence." (*Id.*) Therefore, he asserts the officers "had insufficient information to make the stop when they did." (*Id.*) He requests the Court suppress all evidence obtained from the stop, including statements from each individual and physical evidence seized from the vehicle and each person.[9] (*Id.* at 6.)

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. "'A traffic stop constitutes a seizure under the Fourth Amendment,' and must be supported by either probable cause or an articulable suspicion that a violation of law has occurred." *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017) (quoting *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008); *United States v.*

---

[9] Defendant Yackel makes no further specific argument as to why the statements should be suppressed; therefore, the Court presumes his argument is based on a fruit-of-the-poisonous-tree theory. Defendant Yackel also does not challenge the search warrant issued for the search of this vehicle or affidavit supporting the search warrant. Because his argument is based solely on lack of probable cause for the initial stop of the vehicle, the Court presumes his request to suppress evidence seized from the vehicle is based on a fruit-of-the-poisonous-tree theory.

*Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007)). The police may search a vehicle without a warrant when they have probable cause to believe it contains evidence of criminal activity. *United States v. Parks*, 902 F.3d 805, 813 (8th Cir. 2018). Probable cause exists when "the facts available [to an officer] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quotations omitted). Courts "routinely look to the collective knowledge of all officers involved in an investigation to determine whether probable cause exists provided there is some degree of communication among the relevant officers." *United States v. Poe*, 462 F.3d 997, 1001 (8th Cir. 2006).

Here, the police had probable cause to believe that the Expedition that left the CRI's farm site at approximately 8:00 a.m. on December 19, 2017, contained contraband or other evidence of a crime. "Where an informant has provided reliable information in the past, and where officers are able to corroborate important details from a current tip that a subject is engaged in drug trafficking, there is probable cause to believe that an offense has been or is being committed." *United States v. Edwards*, 891 F.3d 708, 711 (8th Cir. 2018); *see also United States v. Hambrick*, 630 F.3d 742, 747 (8th Cir. 2011) ("To support a probable cause determination, officers may rely on an informant's tip if the informant has provided reliable information in the past or if his tip is independently corroborated."). The CRI provided reliable information in the past, including during his participation in over six first-degree felony controlled substance purchases and when providing information over a dozen times that Officer Hillesheim was able to corroborate

through independent investigation. (Hr'g Tr. 18.) And in this instance, details provided

by the CRI were corroborated:

- The CRI told Officer Hillesheim that D.K. recently agreed to provide him with three more pounds of methamphetamine (Hr'g Tr. 18), which was corroborated by a recorded phone call between the CRI and D.K. during which D.K. agreed to drive down with drugs to sell to the CRI. (Hr'g Tr. 12, 28.)

- The CRI told Officer Hillesheim that D.K. would be driving a Ford Expedition, which later was corroborated with the fact that D.K. did drive a Ford Expedition. (Hr'g Tr. 12–13, 28.)

- The CRI told Officer Hillesheim that D.K. would not be able to come down the evening of December 18, 2017, because another person associated with D.K. had been arrested that evening (Hr'g Tr. 13–14), which was corroborated through a Minnesota Department of Public Safety State Patrol report that this certain person had been arrested at about 9:32 p.m. on December 18, 2017. (Hr'g Tr. 13.)

- The CRI reported to an officer that D.K. and two other people had shown up at his farm site at 4:00 a.m., and based on him seeing them with an ounce of methamphetamine and based on discussions with them, he believed they had another two pounds with them to sell (Hr'g Tr. 14 – 17), which was corroborated by a phone call that the CRI placed to D.K. later, whereby D.K. agreed to leave the farm site to go to Evan where the source of the money was to make the transaction, and which was also corroborated by the fact that the officers then viewed a black Ford Expedition leave the farm site and head in the direction of Evan. (Hr'g Tr. 17, 31–32.)

Therefore, this Court finds that the CRI provided reliable information. To establish

reasonable suspicion or probable cause for a traffic stop, information from an informant

must be reliable. *See United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995). If an

informant does not have a history of providing reliable information (which here the CRI

does), his reliability may nonetheless be established through independent verification or

corroboration by police officers. *Id.* (citations omitted). Even "the corroboration of

minor, innocent details can suffice to establish probable cause." *United States v. Reiner*

*Ramos*, 818 F.2d 1392, 1397 n.7 (8th Cir. 1987); *see also United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009) (quoting *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (analyzing known informant's statement against penal interest as sufficiently reliable based on corroboration of defendant's nickname and description of his car)). The above corroborated information provided the officers with probable cause to believe that methamphetamine, or other evidence of the crime, would be found in the Expedition or on the person of the occupants in that vehicle. *See United States v. Rowe*, 878 F.3d 623, 629 (8th Cir. 2017) (concluding that probable cause already existed for the stop of the vehicle based on the information provided by a CI indicating that the BMW contained cocaine); *see also United States v. Edwards*, 891 F.3d 708, 711 (8th Cir. 2018) ("Where an informant has provided reliable information in the past, and where officers are able to corroborate important details from a current tip that a subject is engaged in drug trafficking, there is probable cause to believe that an offense has been or is being committed.") (citing *Draper v. United States*, 358 U.S. 307, 312–14 (1959)). Therefore, the stop and search of the vehicle and the occupants was lawful and Defendant Yackel's Motion to Suppress Evidence (Doc. No. 75) should be denied.[10]

---

[10]    Because Defendant Yackel's only argument is lack of probable cause for the stop, and because this Court finds there was probable cause, this Court need not address the additional arguments made by the Government regarding the arrest and search of Defendant Yackel's person.

This Court notes, however, that the stop of the vehicle and the search of Defendant's person was also permissible under *Terry v. Ohio*, 392 U.S. 1 (1968). *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (stating that under *Terry v. Ohio*, a police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop

(Footnote Continued on Next Page)

## II. December 27, 2017 traffic stop

### a. Background

Officer Mark Marah from the Brooklyn Park Police Department testified as follows about the December 27, 2017 traffic stop and regarding information that officers were aware of leading up to the traffic stop. (Hr'g Tr. 46–120.)

---

(Footnote Continued from Previous Page)

when the officer has a reasonable, articulable suspicion that criminal activity is afoot"); *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008) ("A law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.") (quotations omitted). For a valid *Terry* stop, "[t]he government must prove that the officer had reasonable suspicion that criminal activity was afoot, not that the subject of the stop was actively engaged in a crime." *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016). Reasonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated. *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007). "During a Terry stop, the officer may do a pat-down search for protective reasons if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous." *Id.* (quotations omitted). Upon finding methamphetamine on the other two occupants of the vehicle during the pat-down search, if it was not a probable cause stop from the outset it would have transformed the stop into a probable cause stop at that point, which justified the search and arrest of Defendant's person. *See United States v. Edwards*, 891 F.3d 708, 711 (8th Cir. 2018) (stating that "[p]robable cause to arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime.") (quotations omitted); *see also id.* (stating that the standard is "not a high bar," and it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.") (quoting *District of Columbia v. Wesby*, ⸺ U.S. ⸺, 138 S.Ct. 577, 586 (2018)).

Further, the search warrant for the Expedition also provided an independent basis for the search and seizure of the evidence in the vehicle, even if information relating to the search of Defendant's person were removed. *See United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013) ("Under the independent source doctrine, the exclusionary rule is inapplicable where the evidence was acquired through a source independent of the tainted search.").

Officer Marah has been a police officer for approximately five years and works the night shift in Brooklyn Park enforcing city ordinances and responding to 911 calls, including calls about drugs, violence, and domestic assaults. (Hr'g Tr. 46.) Officer Marah patrols an area surrounding an apartment complex on West River Road. (Hr'g Tr. 47.) This particular apartment complex is often surveilled[11] because it is considered a "hot spot" or "target-rich environment." (Hr'g Tr. 49.) Several traffic stops from that location have resulted in "first degree drug sales." (*Id.*) Firearms have been seized. (*Id.*) Officer Marah was aware that a tenant named Miguel Angel Palma-Gallardo ("Palma") was under investigation by multiple jurisdictions for the large sale of narcotics. (Hr'g Tr. 47.) Officer Marah had learned from other officers prior to December 27, 2017, that Palma's lease was being canceled due to criminal activity and that he would be evicted from the apartment soon. (Hr'g Tr. 51.)

On December 27, 2017, Officer Marah and another officer (driving a separate vehicle) responded to a 911 call from someone at the apartment complex at approximately 1:45 a.m., describing a U-Haul in the parking lot with multiple males coming and going from it. (Hr'g Tr. 51.) The caller explained that she had lived there for eleven years and found this very suspicious given the time of day, the day of the week (Wednesday), and because she did not recognize the people coming and going from the U-Haul. (Hr'g Tr. 51–52.) Officer Marah suspected that the activity might be related to Palma. (*See id.*) Upon arrival, Officer Marah located a U-Haul in the parking lot and

---

[11]    Officer Marah conducted approximately 200 to 300 hours of surveillance in the area of the apartment complex. (Hr'g Tr. 49.)

another vehicle—a black SUV—was leaving. (Hr'g Tr. 53.) The other officer stopped the black SUV and the occupants of that vehicle told the officer that they were helping someone move out of the apartment. (Hr'g Tr. 54.) As this information was relayed to Officer Marah, the U-Haul began to exit the parking lot. (*Id.*) Officer Marah conducted a traffic stop on the U-Haul based on his suspicion that more was going on than just moving. (*Id.*) Officer Marah found nothing notable in the U-Haul. (Hr'g Tr. 55.)

Officer Marah asked the U-Haul driver what was going on, and the driver said he was helping someone out, but did not know who they were. (*Id.*) The driver also stated that there would be other individuals coming to the apartment. (*Id.*) During the stop, the U-Haul driver's phone rang and he answered it. (Hr'g Tr. 57.) After the call, the driver told Officer Marah that a person named Kiersten Olson would be coming to the apartment. (*Id.*) Officer Marah also knew to expect the arrival of a white Pontiac Grand Prix. (Hr'g Tr. 99.) Kiersten Olson was very familiar to Officer Marah. Prior to December 27, 2017, Officer Marah had learned through previous traffic stops of Kiersten Olson that she was someone who was "highly involved in criminal activity, including stolen vehicles and possession of narcotics." (Hr'g Tr. 50.) After one incident, Officer Marah learned that Olson was wanted on multiple felony warrants. (*Id.*) After learning that Olson was coming to the apartment complex, Officer Marah let the U-Haul driver go. (Hr'g Tr. 57.)

Officer Marah moved his vehicle approximately 150 yards away to conduct surveillance on the apartment complex. (Hr'g Tr. 58, 99.) He saw a white Pontiac Grand Prix pull up on the north side of the building. (Hr'g Tr. 58.) Shortly thereafter, a Dodge

pickup truck pulled up. (Hr'g Tr. 58, 61.) Officer Marah observed individuals come and go from the back door of the apartment to and from these vehicles for the next few hours, hauling things consistent with moving and placing those things in both vehicles. (Hr'g Tr. 58.) Looking through binoculars, Officer Marah saw a female who matched the physical characteristics of Kiersten Olson, however, he was not certain it was her at the time. (Hr'g Tr. 58–59.) He ran her record and learned that she had five outstanding warrants. (Hr'g Tr. 59.) Officer Marah deduced that Palma was probably moving out, but he still found the activity suspicious based on the time of day (now 3 or 4 o'clock in the morning), day of the week (Wednesday), and because Kiersten Olson was to be there. (Hr'g Tr. 60–61.)

Officer Marah then observed the two vehicles leaving the apartment parking lot. (Hr'g Tr. 61.) The Pontiac pulled out first, followed by the truck. (*Id.*) Officer Marah and another officer followed in a separate squad car. (Hr'g Tr. 62.) The Pontiac and truck both failed to signal 100 feet prior to an intersection, Officer Marah passed the truck and pulled up behind the Pontiac. (*Id.*) Officer Marah observed the Pontiac cross over the right-hand fog line and continue driving there for some time. (*Id.*) The other squad car pulled over the truck. (Hr'g Tr. 106.) Failure to signal and crossing over the fog line are violations of Minnesota law. (Hr'g Tr. 62.)

After Officer Marah stopped the Pontiac, he turned his spotlight on the vehicle, and approached. (Hr'g Tr. 62–63.) As he approached, he observed a male driver, who was soon identified as Defendant Yackel. (Hr'g Tr. 63.) He did not immediately recognize Yackel because his head was turned. (Hr'g Tr. 122.) However, when he saw

Yackel's face, Officer Marah was able to connect him to reports where he had previously learned about Yackel and his involvement with first degree narcotics cases along with an assaultive history. (Hr'g Tr. 63, 120–21.)

Officer Marah asked Yackel for his driver's license and insurance; in response, Yackel gave Officer Marah a "federal ID," stated he did not have his driver's license on him (which is a violation of Minnesota law), and provided proof of insurance. (Hr'g Tr. 63–64.) Officer Marah ran the insurance provided and learned that the vehicle was not registered to either Yackel or Olson. (Hr'g Tr. 64.) Yackel was "breathing very heavy, his hands were shaking and . . . he was visibly nervous." (Hr'g Tr. 65.)

Before recognizing Yackel, Officer Marah's main concern was to confirm if Kiersten Olson was in the car. (Hr'g Tr. 107–08.) As he initially approached the driver's side of the Pontiac, he observed a blonde female in the passenger seat who appeared to be Kiersten Olson. (Hr'g Tr. 63.) Officer Marah looked inside the vehicle past Yackel and confirmed that it was indeed Kiersten Olson sitting in the front passenger seat. (Hr'g Tr. 65.) Officer Marah decided that Olson would be arrested based on the outstanding warrants. (Hr'g Tr. 66–67.) While Officer Marah's attention then turned to Yackel, the second officer approached Olson on the passenger's side to place her in handcuffs. (Hr'g Tr. 67, 76.)

Officer Marah had Yackel step out of the vehicle and he conducted a *Terry* frisk due to safety concerns. Officer Marah testified that he did this because of previous stops pertaining to the apartment complex where stolen firearms were found and therefore officer safety was a concern, and because he knew that Olson had possessed stolen

vehicles and had a history of fleeing. (Hr'g Tr. 67–68.) He was also aware of multiple

warrants. (Hr'g Tr. 50, 59, 102.) Even though Officer Marah observed items in the

backseat of the vehicle, such as hampers, that were consistent with someone helping

another to move (Hr'g Tr. 68), he also suspected that the activity at the apartment

complex related to "short-term" drug trafficking—i.e., where a person comes to a place

for a short period to buy or sell narcotics, and then leaves within a few minutes—

involving Palma. (Hr'g Tr. 56–57.)

After getting Yackel out of the vehicle, the second officer removed Olson from the

passenger side. (Hr'g Tr. 110.) As Officer Marah focused on Yackel, he could hear Olson

giving his colleague a false name. (Hr'g Tr. 110.) Officer Marah brought Yackel to the

front of his squad car and had him place his hands behind his back to begin the *Terry*

frisk. (Hr'g Tr. 68.) He located a large bulge in Yackel's front left breast pocket, which

felt like either money or a large bag of drugs, but not a weapon. (*Id.*) He asked Yackel

what it was, and Yackel told him it was money. (Hr'g Tr. 68–69.) Officer Marah did not

suspect this bulge to be a weapon. (Hr'g Tr. 68.) Officer Marah then removed the cash

from Yackel's pocket. (*Id.*)

Officer Marah continued the *Terry* frisk and felt a large, hard bulge on his inner

thigh of Yackel's right leg about the size of a brick; Officer Marah did not know what it

was but was concerned that it could be a weapon or a case holding a weapon. (Hr'g

Tr. 69–70, 114.) Officer Marah asked Yackel what that bulge was, and he stated it was

approximately $30,000 in cash strapped to his leg. (Hr'g Tr. 70.) Officer Marah testified

that he "had no idea what it was," and was concerned that the large, hard bulge could be a weapon – even after Yackel told him it was $30,000 in cash. (Hr'g Tr. 69–70, 74–75.)

Officer Marah continued the *Terry* frisk looking for weapons and felt a smaller bulge in Yackel's small coin pocket on the right-hand side of his jeans. Officer Marah looked at that area (which was an area where he commonly saw narcotics) and could see a corner of a plastic bag sticking out of that coin pocket. (Hr'g Tr. 70–71.) After feeling the coin pocket bulge, Officer Marah excluded that it was a weapon and "thought that was going to be a bag of narcotics" based on the packaging. (Hr'g Tr. 73.) Having excluded the bulge as a weapon, Officer Marah asked Yackel whether it was a bag of dope; Yackel answered, "yes." (Hr'g Tr. 74.) After hearing this, Officer Marah pulled the plastic bag from Yackel's coin pocket. (*Id.*) It was later determined that the bag contained approximately nine Ecstasy pills. (*Id.*)

Without further assessing the bulge on Yackel's inner thigh, Officer Marah placed Yackel in handcuffs and put him in the backseat of the squad car for a short period while Officer Marah assisted the second officer in "dealing with" and placing handcuffs on Olson. (Hr'g Tr. 74–76, 116.) After dealing with Olson, Officer Marah returned to Yackel. He testified that he "removed [Yackel] from the squad car, uncuffed one hand and slowly allowed him to remove that item from his leg," and stated that "that's where I could see that it was actually cash." (Hr'g Tr. 74.)

The cash and the plastic bag (which contained the Ecstasy pills) were seized. (Hr'g Tr. 74–75.) Officer Marah also searched Olson's purse and a bag, which were in the front passenger side of the vehicle near where Olson's feet would have been, and found over a

pound of methamphetamine. (Hr'g Tr. 78, 80.) The vehicle was then impounded. (Hr'g

Tr. 83.) From the time the initial stop took place until he searched the inside of the

vehicle, approximately five to ten minutes had passed. (Hr'g Tr. 77.)

### b. Analysis

#### i. Traffic Stop

First, Defendant Yackel argues that the stop of the white Pontiac on December 27,

2017, was not based on reasonable suspicion or probable cause, but was done instead

based on a hunch that Kiersten Olson might be in the vehicle. (Doc. No. 101, Def.'s

Mem. 10–11.) Defendant's concern, however, is beside the point. If an officer

"objectively has a reasonable basis for believing that the driver has breached a traffic

law," the officer has probable cause to conduct a traffic stop. *United States v. Thomas*, 93

F.3d 479, 485 (8th Cir. 1996); *see also United States v. Brown*, 345 F.3d 574, 578 (8th

Cir. 2003) (stating that when an officer sees a violation of a traffic law, even a minor one,

he has probable cause to stop the vehicle); *Whren v. United States*, 517 U.S. 806, 810

(1996) (same). And an officer who observes a minor traffic violation can stop the vehicle

even if the stop is a pretext for another investigation. *See, e.g.*, *United States v. Coney*,

456 F.3d 850, 885–56 (8th Cir. 2006); *see also Whren*, 517 U.S. at 813 (holding that an

officer's subjective intentions for conducting a traffic stop "play no role in ordinary,

probable-cause Fourth Amendment analysis").

This Court finds the officer's testimony credible that he observed the driver of the

white Pontiac fail to signal a turn 100 feet prior to an intersection and that the driver then

crossed over the fog line – two different traffic violations. Therefore, because the officer observed these two traffic violations, probable cause existed to stop the vehicle.

### ii. *Terry* Frisk

Second, Defendant Yackel argues that once the car was pulled over, Officer Marah did not have reason to have him exit the vehicle for a *Terry* frisk because Officer Marah was not justified in believing that Yackel was armed or presently dangerous when all that had occurred was a traffic violation along with failure to provide a Minnesota license and considering Yackel did not have anything to do with the pending warrants for Olson. (Doc. No. 101, Def.'s Mem. 10–11.) Yackel also asserts that if Officer Marah believed that criminal activity was afoot based on his surveillance at the apartment complex, then he should have investigated immediately. (*Id.* at 10.)

As explained above, the vehicle was lawfully stopped. Once that stop occurred, Officer Marah was permitted to order Yackel to step out of the vehicle without violating the Fourth Amendment. *Maryland v. Wilson*, 519 U.S. 408, 414–415 (1997). The question then is whether a *Terry* frisk was justified.

The United States Supreme Court has held a warrantless pat-down search for weapons is permissible when there are "specific and articulable facts which, taken together with rational inferences from those facts," would lead a police officer reasonably to believe the suspect is "armed and presently dangerous to the officer or to others." *Terry v. Ohio*, 392 U.S. 1, 21 & 24 (1968); *see United States v. Menard*, 95 F.3d 9, 10–11 (8th Cir. 1996). "To decide whether there is a reasonable, articulable suspicion that a suspect is armed and presently dangerous, we consider the totality of circumstances

known to the officer at the time of the search." *United States v. Glenn*, 152 F.3d 1047,

1048–49 (8th Cir. 1998); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002)

(stating that the determination of whether reasonable suspicion existed to justify a *Terry*

weapon frisk is based on the totality of the circumstances). The totality of the

circumstances include the suspect's location, a history of crime in the area, the suspect's

nervous behavior and evasiveness, and the officer's "commonsense judgments and

inferences about human behavior." *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir.

2003) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000)). In addition, the

Supreme Court has recognized that "danger to an officer from a traffic stop is likely to be

greater when there are passengers in addition to the driver in the stopped car." *Maryland

v. Wilson*, 519 U.S. 408, 414 (1997).

  Here, the following facts relate to whether a reasonable suspicion existed to justify

Officer Marah's pat-down search of the driver, Defendant Yackel: (1) the location of the

stopped vehicle was near a high-crime area; (2) the stop was conducted in the early

morning hours after over-night surveillance of a location where "short-term" drug

trafficking activity was prevalent and where suspicious activity of an over-night move

was taking place; (3) Officer Marah knew that Defendant Yackel had been involved with

drug sales and assault charges in the past; (4) the passenger in the vehicle (Olson) was a

person wanted on several warrants and who was "highly involved in criminal activity,

particularly stolen vehicles and narcotics" (Hr'g Tr. 49–50, 52, 66–67); (5) the vehicle

was registered to someone else; and (6) when Officer Marah approached the driver's side

of the vehicle, Yackel was "breathing very heavy, his hands were shaking and . . . [he]

was visibly nervous." (Hr'g Tr. 65, 107.) Taken together, the totality of these facts support that reasonable suspicion was present to justify the pat-down search. *Cf. United States v. Rowland*, 341 F.3d 774, 784 (8th Cir. 2003) (holding that the inherent danger of the traffic stop coupled with the fact that neither person in the vehicle could prove ownership of the vehicle justified a *Terry* search because possible car thieves might possess weapons); *United States v. Menard*, 95 F.3d 9, 10–11 (8th Cir. 1996) (finding reasonable, articulable suspicion because officer was outnumbered by vehicle's occupants, officer recognized one passenger as drug trafficker found to be carrying a weapon, and stop occurred late at night on deserted road); *United States v. Woodall*, 938 F.2d 834, 837 (8th Cir. 1991) (stating officer had reasonable suspicion sufficient to search driver during routine traffic stop because officer recognized driver as drug trafficker and knew drug traffickers often carried weapons). As such, the pat-down was justified and did not violate Defendant Yackel's constitutional right to be free from unreasonable search and seizure.

### iii.   Scope of Search and the Plain-View and Plain-Feel Doctrines

Finally, Defendant Yackel argues that even if Officer Marah had a reasonable basis to conduct a pat-down search, he exceeded what the law allows. (Doc. No. 101, Def.'s Mem. 12.) Defendant Yackel asserts that Officer Marah's feeling the three bulges in Defendant's breast pocket, pant leg, and coin pocket did not justify the detention or seizure of the property.

As explained by the Eighth Circuit,

> Under *Terry*, a law enforcement officer may conduct a warrantless pat-down search "for the protection of himself or others nearby in order to discover weapons if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous." *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002) (citing *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). "Because the 'sole justification' for such a search is the protection of the officer and others, its scope must be confined to a search reasonably designed to discover concealed weapons." *Id.* (quoting *Terry*, 392 U.S. at 29, 88 S.Ct. 1868). An officer may, however, seize other evidence discovered during a pat-down search for weapons as long as the search "stays within the bounds marked by *Terry*." *United States v. Hanlon,* 401 F.3d 926, 930 (8th Cir. 2005) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)).

*United States v. Muhammad*, 604 F.3d 1022, 1026 (8th Cir. 2010).

The plain-view doctrine allows a police officer to seize evidence without a warrant when (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) the object's incriminating character is immediately apparent, and (3) the officer has "a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128 (1990). In *Minnesota v. Dickerson,* 508 U.S. 366, 373 (1993), the Supreme Court established the "plain touch" or "plain feel" concept as an analogue to the plain-view doctrine. *Id.* at 375–76. Therefore, when an officer conducting a *Terry* search feels an item that is immediately apparent to be contraband, an officer may seize it. *Dickerson*, 508 U.S. at 375. The Court in *Dickerson* explains the plain-feel exception as follows: "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity *immediately apparent*, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* (emphasis added). That is to say, the object must be one "whose contour or mass makes its identity immediately apparent." *Id.*

### (a) Yackel's Breast Pocket

Defendant Yackel asserts that Officer Marah went beyond what is permissible under *Terry* when he removed the cash from Yackel's breast pocket. In its response, the Government concedes this point. (Doc. No. 105, Gov'ts Mem. in Opp'n to Def.'s First and Second Mots.to Suppress ("Gov'ts Mem.") 19 ("The government concedes that with respect to the first and third bulges, Marah was not permitted under *Terry* to remove the items, as he had determined that they were not weapons and, therefore, not within the scope of a *Terry* frisk.").) Defendant Yackel's motion to suppress the cash found in his breast pocket should therefore be granted.

### (b) Yackel's Coin Pocket

As stated above, the Government concedes that Officer Marah was not permitted to remove the baggie from Yackel's coin pocket pursuant to *Terry*, because Officer Marah had determined it was not a weapon. The Government, however, contends that Defendant's motion to suppress should be denied because the Ecstasy pills found in the baggie were discovered in plain view.

The Government's plain-view argument fails because it has not shown the incriminating nature of a corner of a plastic bag or that the baggie's contents were "immediately apparent" to Officer Marah as containing a weapon or contraband. Officer Marah testified that upon feeling the small bulge in the coin pocket and seeing a corner of a plastic bag sticking out of the pocket, he did not think it contained a weapon, but he thought it was going to be a "bag of narcotics." (Hr'g Tr. 71.) While Officer Marah testified that he has seen "numerous plastic bags, cellophane wrappers, Saran wrap, all

sorts of different kinds of plastics that contain narcotics" (Hr'g Tr. 73), he did not explain why the corner of the baggie that he observed was suspicious or made it immediately apparent that it would contain narcotics that would be considered contraband.[12] Using a baggie to hold narcotics is just one use of countless others; and as Officer Marah explained, narcotics could be contained in all different types of plastic wrapping. In addition, instead of confirming that it was because *of the feel* of the baggie that made him believe that it was going to contain narcotics, he testified that it was simply because it was located in this small pocket and it was found during early morning hours. (Hr'g Tr. 73.) Such reasons do not justify expanding the scope of a *Terry* search.

It was after Officer Marah felt the pocket and after Officer Marah saw the corner of the baggie sticking out of the pocket that he then asked Yackel what was in the baggie. Therefore, Officer Marah's testimony shows that it was not immediately apparent to him from feel alone that the baggie contained contraband; it only became apparent after he

---

[12]    Not all narcotics are illegal. Officer Marah did not testify that based on the feel of the bulge during the *Terry* frisk it felt like a certain illegal narcotic. *See United States v. Hughes*, 15 F.3d 798, 802 (8th Cir. 1994) (testifying that the officer felt lumps he believed to be crack cocaine); *see also United States v. Seabrooks*, 3:17-cr-00360-MOC-DSC, 2018 WL 2023132, at *5 (W.D.N.C. May 1, 2018) (questioning how an officer can distinguish between a pill that is lawful from one that is unlawful based on a limited pat down). Further, this case is unlike *United States v. Williams*, where the officer, prior to the *Terry* frisk, had seen the defendant put what the officer reasonably believed to be illegal narcotics in the pocket minutes before the stop, and where therefore the confirming bulge provided probable cause for defendant's arrest. 139 F.3d 628, 630 (8th Cir. 1998). The Supreme Court has clarified that "an item's incriminatory nature is immediately apparent if the officer at that moment had 'probable cause to associate the property with criminal activity.'" *United States v. Cowan*, 674 F.3d 947, 953 (8th Cir. 2012) (citing *Texas v. Brown*, 460 U.S. 730, 741–42 (1983) (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980))).

asked Yackel the question of what it contained. *See Dickerson*, 508 U.S. 366, 373 (1993); *see also Seabrooks*, 2018 WL 2023132, at *5 ("[I]t is unclear in this case just how even an experienced officer—even one who comes from a medical family and has experience as an EMT—can distinguish between a pill that is lawful from one that is unlawful based on the limited pat down allowed by *Terry* compared to the one disapproved of in *Dickerson*.").[13]

Officer Marah's question ("is that a bag of dope?") went too far. In *Dickerson*, the United States Supreme Court held that an officer could not explore an individual's pocket after having concluded that the object was not a weapon. The Court found that such a search "was unrelated to '[t]he sole justification of the search [under *Terry*] . . . the protection of the police officer and others nearby.'" *Dickerson*, 508 U.S. at 378 (quoting *Terry*, 392 U.S. at 29). Therefore, "[o]nce the officer determines from his sense of touch

---

[13]    In *Dickerson*, the Supreme Court concluded a frisk search exceeded the scope of *Terry* because the incriminating nature of the contents of the defendant's pockets were not immediately apparent to the officer. Rather, "the officer determined that the lump was contraband only after 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket – a pocket which the officer already knew contained no weapons.'" *Hughes*, 15 F.3d at 802 (quoting *Dickerson*, 508 U.S. at 378). The Eighth Circuit distinguished *Dickerson* in *Hughes*. In *Hughes*, while an officer conducted a pat-down search for weapons, the officer felt, in the subject's front pants pocket, some small lumps he believed to be crack cocaine. The court held that because the officer immediately suspected the lumps were crack cocaine, seizure of the contraband was authorized under the *Terry* test. *Hughes*, 15 F.3d at 802. Here, this case falls somewhere between *Dickerson* and *Hughes*. While there is no evidence that Officer Marah manipulated the baggie to determine what it contained, it also was not immediately apparent to Officer Marah after the *Terry* frisk that the baggie contained illegal pills. It was only after he further "manipulated" the situation by asking Yackel what was in the baggie that he then suspected what the baggie contained.

that an object is not a weapon, the pat down frisk must stop." *State v. Lawson*, 906

N.E.2d 443, 449 (Ohio Ct. App. 2009) (quotations omitted). "The officer, having

satisfied himself or herself that the suspect has no weapon, is not justified in employing

*Terry* as a pretext for a search for contraband." *Id.* (quotations omitted). Officer Marah

committed a *Dickerson* violation when he questioned Yackel about the items in his

pocket. Similar to the circumstance in *United States v. Lemons*, here "[t]he *Terry* search

was a limited search for weapons. It is clear that at the time [Officer Marah] asked

[Yackel] about the items in [Yackel's] pocket [Officer Marah] was sure the items were

not weapons. Thus, questioning [Yackel] about the nonweapons in his pocket—whether

ammunition or anything else—was an intrusion beyond the scope of the *Terry* search."

*United States v. Lemons*, 153 F. Supp.2d 948, 959 (E.D. Wis. 2001).

Officer Marah's successive actions to determine the content of the baggie in

Yackel's pocket cannot fall within the bounds of the plain-touch doctrine. Even if he had

a suspicion during the frisk, it was not immediately apparent, and he developed probable

cause for the search and seizure only after an intrusion beyond the scope of *Terry*.[14]

---

[14]     While Yackel has not sought to suppress his answers to Officer Marah's questions, the questions might also trigger *Miranda* concerns because at the point in time when Officer Marah asked the question, he had already excluded the possibility of a weapon and suspected narcotics. Therefore, Officer Marah should reasonably have been aware that the information sought would elicit potentially incriminating information, and arguably the question was asked in a custodial setting. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (stating that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," and explaining that the latter means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect").

Accordingly, Defendant Yackel's motion to suppress the pills found in his coin pocket should be granted based both on the Government's concession and because the Government's plain-view argument fails.

### (c) Inner Thigh of Yackel's Right Leg

Next, Defendant Yackel asserts that Officer Marah went beyond what is permissible under *Terry* when after he felt a large, hard bulge on Yackel's inner right thigh, he did not immediately seize the contents. Instead, Officer Marah handcuffed Yackel, placed him in the backseat of his squad car, and only after a period of time did he remove Yackel's handcuff and have him remove the item from his leg. The Government acknowledges that Officer Marah "did not immediately search the larger bulge on the defendant's right thigh, but elected to first handcuff the defendant and place him in his squad car."[15] (Gov'ts Mem. 20.)

The Eighth Circuit has explained that "the 'sole justification' for [a *Terry*] search is the protection of the officer and others," therefore, "its scope must be confined to a search reasonably designed to discover concealed weapons." *Roggeman*, 279 F.3d at 577 (quoting *Terry*, 392 U.S. at 29). When an officer encounters a hard object during a pat-down search that the officer reasonably believes could be a weapon or could conceal a

---

[15]     Citing *United States v. Tovar-Valdivia*, 193 F.3d 1025 (8th Cir. 1999), the Government says that under these facts, it "is reluctant to argue that the seizure of the $30,000 in cash was permissible under *Terry*" (Gov'ts Mem. 20), because in *Tovar-Valdivia*, the court noted that *Terry* does not "authorize the police officer to handcuff and search an individual after the initial pat-down of the bulge did not confirm the existence of a weapon or contraband." *Tovar-Valdivia*, 193 F.3d at 1028 n.1.

weapon, the officer is justified under *Terry* to seize the item to maintain the officer's

safety. *See, e.g.*, *United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010)

(holding that the Fourth Amendment permitted an officer to remove four-inch long by

three-inch wide "hard object" from defendant's pocket because the officer reasonably

believed it "could be a weapon or could conceal a weapon that presented a threat to

officer safety, such as a knife, box cutter or razor blade"). And "[w]hile the 'purpose of a

pat-down search is not to discover evidence of crime, but to allow the officer to pursue

his investigation without fear of violence,' and while the search must therefore 'be

strictly limited to that which is necessary for the discovery of weapons which might be

used to harm the officer or others nearby,' . . . officers may lawfully seize contraband

they incidentally discover in 'plain touch' during a *Terry* frisk." *United States v. Bustos-

Torres*, 396 F.3d 935, 943–44 (8th Cir. 2005) (quoting *Dickerson*, 508 U.S. at 373). The

Eighth Circuit has found that "the plain-touch doctrine extends to the lawful discovery of

any incriminating evidence, not just contraband such as drugs." *United States v. Bustos-

Torres*, 396 F.3d 935, 944 (8th Cir. 2005) (citing *United States v. Hernandez–Rivas*, 348

F.3d 595, 599 (7th Cir. 2003) (tacitly recognizing plain-touch doctrine would justify

seizure of $10,000 in cash); *United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001)

("[I]f an officer feels an item that he recognizes as contraband or *evidence,* that touch

may provide probable cause for the arrest of the person and seizure of the *evidence.*"

(emphasis added))).

      The question here is whether Officer Marah reasonably believed upon the *Terry*

frisk that the bulge could be a weapon or could be a case concealing a weapon. Officer

Marah testified that upon his feel he was concerned that the large, hard bulge could be a weapon or a case holding a weapon. But, he was not sure. He then asked Yackel what the bulge was. (Hr'g Tr. 70.) Yackel responded by saying that it was approximately $30,000 in cash. (Hr'g Tr. 70.) Officer Marah testified that even after he asked Yackel the question, he "had no idea what it was." (Hr'g Tr. 69.) Thus, at this time it was not reasonably apparent that the bulge was a weapon or contraband. Officer Marah's next steps are important. He did not seize the item to maintain his safety. Instead, he moved to frisk *other areas* of Yackel's person and found and removed the baggie of pills from Yackel's coin pocket – which the Government concedes violated *Terry*. He then handcuffed Yackel and placed him in the back of his squad car while he assisted the second officer with Kiersten Olson.

While he may have originally been concerned that the bulge was a weapon, at some point that concern appears to have been dispelled based upon Officer Marah's subsequent actions after turning his attention back to Yackel. Returning to the squad, he asked Yackel to step out of the car and Officer Marah freed up one of Yackel's hands by removing a handcuff. He allowed Yackel himself to reach down and retrieve the item strapped to his leg. Only then did Officer Marah actually see the cash. While this Court believes that Officer Marah may have originally been concerned, his later actions, which allowed Yackel to reach down—uncuffed—for the item is inconsistent with a reasonable belief that the bulge was a weapon. The more reasonable—and credible—explanation is that once Yackel told Officer Marah that the bulge was $30,000 cash, Officer Marah satisfied himself that the bulge did not contain a weapon. Without a reasonable belief that

the bulge contained a weapon, and because it was not immediately apparent during the frisk that the bulge contained contraband, the *Terry* frisk needed to stop. Otherwise, such a search would be "unrelated to '[t]he sole justification of the search [under *Terry*] . . . the protection of the police officer and others nearby.'" *Dickerson*, 508 U.S. at 378 (quoting *Terry*, 392 U.S. at 29). As stated above, an officer who has satisfied himself that the suspect has no weapon, "is not justified in employing *Terry* as a pretext for a search for contraband." *Lawson*, 906 N.E.2d at 449 (quotations omitted). Consequently, the $30,000 cash discovered during the search under Yackel's clothing should be suppressed.[16]

### iv. Vehicle Search

After Officer Marah seized the cash and pills from Yackel, he then searched the white Pontiac and found contraband in bags located on the floor near the front passenger seat. Defendant Yackel argues that if this Court finds that Officer Marah's seizure of cash and pills from his person was unlawful—which this Court does—then the other items

---

[16] It was after the discovery of the Ecstasy pills that Officer Marah placed Yackel in handcuffs. There may have been reason to handcuff Yackel for safety reasons given the fact that there was another occupant in the vehicle that the officers were arresting based on outstanding warrants. It seems to be the position of the Government, however, that the discovery of the Ecstasy pills provided probable cause for Yackel's arrest and seizure of the items at issue. But as explained above, the Ecstasy pills should be suppressed based on a *Terry* and *Dickerson* violation. Because they should not have been discovered, they should not have provided probable cause for Yackel's arrest. *Cf. United States v. Pratt*, 355 F.3d 1119, 1122 (8th Cir. 2004) (stating that "seizures that exceed the bounds of *Terry* . . . can be justified only upon a showing of probable cause"); *see also United States v. Aquino*, 674 F.3d 918, 927 (8th Cir. 2012) (finding probable cause not present when the officer illegally searched the suspect's pant leg).

seized from the vehicle should be suppressed as fruit of the poisonous tree. This Court

disagrees based on the inevitable discovery doctrine and the inventory search exception.[17]

"The inevitable discovery doctrine provides an exception to the exclusionary rule

where 'the prosecution can establish by a preponderance of the evidence that the

information ultimately or inevitably would have been discovered by lawful means.'"

*United States v. Craddock*, 841 F.3d 756, 760 (8th Cir. 2016) (quoting *Nix v. Williams*,

467 U.S. 431, 444 (1984)). The doctrine can be applicable to an inventory search done in

conjunction with an unlawful search incident to arrest. *See United States v. Garreau*, 658

F.3d 854, 856–57 (8th Cir. 2011) (affirming district court's denial of suppression motion

where district court found that a firearm would have inevitably been seized under the

inventory exception).

"[S]earches conducted outside the judicial process, without prior approval by

judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only

to a few specifically established and well-delineated exceptions." *Gant*, 556 U.S. 332,

338 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted)). The

policies supporting the warrant requirement including the concept of probable cause are

---

[17]     Because this Court concludes that Defendant's arrest at the moment when he was
handcuffed was not supported by probable cause, the vehicle search cannot be considered
a proper vehicle search incident to his arrest under *Arizona v. Gant*, 556 U.S. 332 (2009).
Pursuant to *Gant*, the "[p]olice may search a vehicle incident to a recent occupant's arrest
only if the arrestee is within reaching distance of the passenger compartment at the time
of the search or it is reasonable to believe the vehicle contains evidence of the offense of
arrest." *Id.* at 351. The search, however, may have been proper incident to Olson's arrest
pursuant to *Gant*, the record does not explain what Olson's outstanding warrants were
for. Therefore, this Court cannot properly analyze whether "it [wa]s reasonable to believe
the vehicle contain[ed] evidence of the offense of arrest" for Olson. *Id.*

not implicated in an inventory search. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987).

Inventory searches are one of the well-defined exceptions to the warrant requirement of

the Fourth Amendment. *Id.* The routine practice of securing and inventorying a vehicle's

contents is a "response to three distinct needs: the protection of the owner's property

while it remains in police custody, the protection [of] the police against claims or

disputes over lost or stolen property, and the protection of the police from potential

danger." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (internal citations

omitted). "The central question in evaluating the propriety of an inventory search is

whether, in the totality of the circumstances, the search was reasonable." *United States v.*

*Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005). Inventory searches that are "conducted

according to standardized police procedures, which vitiate concerns of an investigatory

motive or excessive discretion, are reasonable." *Id.* Standardized police procedures are

necessary to "ensure that the search is not merely a ruse for general rummaging in order

to discover incriminating evidence." *Id.* (internal quotations and citation omitted). Yet,

the police "may keep their eyes open for potentially incriminating items that they might

discover in the course of an inventory search, as long as their sole purpose is not to

investigate a crime." *United States v. Marshall*, 986 F.2d 1171, 1176 (8th Cir. 1993).

Here, Officer Marah testified that the police had no intention of leaving the vehicle

at the scene. (Hr'g Tr. 80–81.) Olson was under arrest for her outstanding warrants, and

Yackel had no driver's license and the vehicle was registered to someone else. (Hr'g

Tr. 81–83.) In addition, the towing policy provides that "[v]ehicles may be moved or

removed from a highway . . . when left unattended upon any street or highway . . . where

such vehicle constitutes an obstruction to traffic . . . ." (Hr'g Ex. 5 at ¶ 502.2.) The policy further states that towing services will be used "when it is necessary to safeguard a vehicle due to the inability of the owner or operator to take the required action" or "[w]hen it is otherwise necessary to store a motor vehicle." (Hr'g Ex. 5 at ¶ 502.3.) The policy then requires an inventory search for all vehicles impounded. (Hr'g Ex. 5 at ¶ 502.5 ("All property in a stored or impounded vehicle shall be inventoried . . . This includes the trunk and any compartments or containers, even if they are closed and/or locked.").) Therefore, the record supports finding that the search of the vehicle was inevitable and permissible as an inventory search. *See United States v. Frasher*, 632 F.3d 450, 454 (8th Cir. 2011) (finding that when there "was no responsible person able to take immediate custody of the vehicle," and where "[s]tandard protocol was to tow [the] vehicle," the search of the vehicle was permissible as an inventory search). Accordingly, this Court recommends that Defendant Yackel's motion to suppress the evidence found in the white Pontiac be denied.

## RECOMMENDATION

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant Yackel's Motion to Suppress Evidence (Doc. No. 75) be **DENIED**; and

2.    Defendant's Yackel's Second Motion to Suppress Evidence (Doc. No. 76)

be **GRANTED IN PART** and **DENIED IN PART**.


Date:  November 29, 2018                    _s/ Becky R. Thorson_____
                                            BECKY R. THORSON
                                            United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **December 13, 2018**. A party may respond to those objections by **December 27, 2018**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.